IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 07 CR 07 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| Scott Lewis and Vernon Williams, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Defendants Scott Lewis ("Lewis"), Vernon Williams ("Williams") and Lavoyce Billingsly ("Billingsly") were charged with conspiracy to knowingly and intentionally possess with intent to distribute a controlled substance, namely, in excess of five kilograms of cocaine in violation of 21 U.S.C. § 846 (Count One), attempt to knowingly and intentionally possess with intent to distribute in excess of five kilograms of mixtures containing cocaine in violation of 21 U.S.C. § 846 (Count Two) and carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A) (Count Three). In addition, Billingsly was charged with possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1) (Count Four). Billingsly was severed from Lewis and Williams and therefore had a separate trial. Lewis and Williams proceeded to trial and the jury convicted them of conspiracy to possess with intent to distribute a controlled substance and carrying a firearm in relation to a drug trafficking crime but acquitted them of attempt. They now each bring a Motion for Judgment of Acquittal and a Motion for a New Trial. For the reasons stated below, both Motions for a New Trial and Motions for Judgment of Acquittal are denied.

## **BACKGROUND**

In December of 2006, a confidential informant who called himself "Rojo" introduced Lewis to a supposed disgruntled drug courier by the name of "Loquito." Loquito, however, was actually Bureau of Alcohol Tobacco and Firearms ("ATF") Special Agent David Gomez ("Gomez"), who was working undercover. According to Gomez's cover story, his employers, a Mexican drug cartel, would at some point give him notice of the location of their current cocaine stash house so that he could go there to pick up cocaine. He instead wanted to steal the cocaine from the stash house and was looking for a robbery crew that would be interested in committing the robbery and splitting up the cocaine. The stash house would be guarded by cartel members with guns and would contain between 15 and 25 kilograms of cocaine. In reality, of course, there was no organization, no stash house and no cocaine.

Lewis spoke to Gomez on the phone and said he was interested and had a crew. Gomez and Rojo met with Lewis on December 15, 2006. The meeting was both audio and video recorded. Gomez told Lewis his cover story and Lewis told Gomez that he had done this type of thing before and that he had a crew willing to commit the robbery. Lewis further suggested that he and his crew enter the stash house as Gomez left after picking up cocaine to make it look like they were robbing him. The crew could then enter the stash house, tie up the occupants and steal the cocaine. Lewis agreed to meet again the following week and to bring his proposed crew.

Lewis spoke to Rojo again on December 17, 2006 and set up a meeting for the next day. Lewis, Williams and an individual known only as "B" met with Gomez and Rojo on December 18, 2006. That meeting was also both audio and video recorded. This was the first time Williams appeared on the scene, and he verbally agreed to commit the robbery more than once during the

meeting. Lewis set forth a new plan for committing the robbery. He proposed that the crew should pretend to be police raiding the stash house. When the occupants became frightened, the crew could tie them up, remove their clothing and steal the cocaine. Williams echoed his agreement with the plan, stating that they should get in and out quickly and that the occupants without a doubt should be stripped "buck naked." Gomez and the others discussed further details of the plan for the robbery including sources for obtaining firearms.

Gomez had further telephone conversations with Lewis over the following weeks, some of which were and some of which were not recorded. Finally, on January 3, 2009 Gomez informed Lewis that the robbery would take place the next day. On January 4, 2007, Lewis, Williams and Billingsly, all riding in a Chevrolet Caprice driven by Billingsly, met Gomez at 61st and Cass Avenue. This meeting was not recorded. According to Gomez this was due to an equipment failure. Lewis and Williams got into the car with Gomez and the CI and they drove to a storage facility where they were to store the cocaine they stole from the stash house. Billingsly followed in the Caprice. At that point, the Defendants were arrested by officers who were hiding in one of the storage lockers. Only videotape (no audio) of the arrest was recorded. The videos showed Billingsly throwing something under the Caprice right before he was arrested. Officers recovered a gun, specifically a Smith & Wesson .40 caliber semi-automatic weapon loaded with seven rounds, from below the Caprice and two boxes of ammunition from its trunk.

As to the missing recordings, Gomez testified that he used only one recording device, although he had previously used two - one for video and a separate one for audio. During the final meeting the device malfunctioned. He further testified that he did not immediately realize that the device malfunctioned because he did not immediately review the tapes. Rather he left them in his

desk drawer for approximately two weeks while he attended to other matters. When he discovered that the device malfunctioned, he sent the device and tapes to the manufacturer to see if any information could be recovered, but he kept no record of this inquiry. In addition, Gomez failed to record some of his telephone calls with Lewis because he did not attach a voice recorder to his phone. He did not mention these recording failures to co-case agent Timothy Wilson until a long time after he discovered them.

At trial, Lewis argued that he was entrapped. Specifically, he testified that he only took part in the robbery because he owed a drug debt to Rojo which he incurred as a result of Rojo introducing him to cocaine. Lewis ran up a $500 drug debt to Rojo which Rojo allowed him to work off by selling some cocaine. Lewis, however, used the cocaine he was supposed to sell resulting in at total of $1000 of drug debt. Lewis testified that Rojo threatened him and he feared for his and his family's safety so agreed to do the robbery in order to pay off the debt. In addition, he asserted that he told Gomez that he did not want to go through with the robbery in a telephone call immediately preceding the robbery that Gomez failed to record. Lewis further testified that he only showed up at the final meeting to discuss his decision not to participate in the robbery with Gomez. Williams relied on an insufficiency of the evidence defense.

Both Defendants were convicted of Counts One and Three - conspiracy and of use of a firearm in a drug trafficking offense - but were acquitted of Count Two - attempt. Both Defendants now bring motions for new trials and for acquittal.

## STANDARDS OF REVIEW

A motion for a new trial under Rule 33(a) should be granted only if required "by the interests of justice." Fed. R. Crim. P. 33(a). Such a motion should be granted sparingly and is only

appropriate if "substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989). A defendant is entitled to a new trial if there is a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict. *See United States v. Berry*, 92 F.3d 597, 600 (7th Cir. 1996). In addition, a court may order a new trial in a criminal case if the evidence "preponderates heavily against the verdict such that it would be a miscarriage of justice to let the verdict stand." *United States v. Swan*, 486 F.3d 260, 266 (7th Cir. 2007) *quoting United States v. Martinez*, 763 F.2d 1297, 1312-13 (11th Cir. 1985).

A motion for judgment of acquittal under Rule 29 challenges the sufficiency of the evidence against the defendant. *See* Fed. R. Crim. P. 29. Such a motion should be denied if, after viewing the evidence in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Hicks*, 368 F.3d 801, 804 (7th Cir. 2004). A conviction should not be overturned unless "the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Curtis*, 324 F.3d 501, 505 (7th Cir. 2003) *citing United States v. Menting*, 166 F.3d 923, 928 (7th Cir. 1999).

## **DISCUSSION**

Lewis and Williams each argue that: 1) prejudicial errors occurred at trial such that justice requires that they be granted new trials; and 2) the evidence was insufficient to support their convictions on Count One and Count Three. Additionally, Lewis argues that he was entrapped, or in the alternative, coerced as a matter of law and thus is not guilty as a matter of law.

<u>**Lewis's Alleged Errors at Trial**</u>

Lewis moves for a new trial arguing that this Court erred by: 1) admitting three of his prior convictions into evidence; and 2) allowing the Government to refer to a prior conviction as "possession of a weapon by a felon."

***Admission of Prior Convictions***

At trial the Court admitted two of Lewis's prior convictions into evidence under Federal Rule of Evidence 404(b) for use in the Government's case in chief: a 1998 conviction for possession of a firearm by a felon and a 2000 conviction for theft. The Court did not admit Lewis's 1991 conviction for residential burglary. In addition, it permitted the use of a 1998 misdemeanor conviction for making a false statement to a police officer for impeachment purposes under Federal Rule of Evidence 609(a)(2).

Under Federal Rule of Evidence 404(b) evidence of a defendant's "other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith" but such "other bad acts" evidence may be admissible for other purposes. Fed.R.Evid. 404(b). In general, in order to be admissible, evidence of other bad acts must meet a three-part test: 1) the evidence be relevant to a matter in issue other than the defendant's propensity to commit the charged crime; 2) the act at issue must be similar in nature and close in time to the crime charged; 3) the prosecution must establish that the defendant committed the act; and 4) the probative value of the evidence must outweigh its prejudicial effect. *See United States v. Bastanipour*, 41 F.3d 1178, 1183 (7th Cir. 1994) *citing United States v. Goodapple*, 958 F.2d 1402, 1406-07 (7th Cir. 1992).

Evidence of other bad acts is, however, admissible to prove predisposition where a defendant presents an entrapment defense because the defense itself puts the defendant's predisposition to

commit the charged crime at issue. *See United States v. Swiatek*, 819 F.2d 721, 728 (7th Cir. 1987) *citing United States v. Moschiano*, 695 F.2d 236, 243 (7th Cir. 1983). All character evidence is not automatically admissible when a defendant sets forth an entrapment defense. *Id*. Rather, although the first element is eliminated, the evidence must still meet the remaining three elements of the test for admissibility under Rule 404(b). *Id*.

At issue here is the similarity between the admitted convictions and the charged crimes. This Court admitted Lewis' 1998 conviction for possession of a firearm by a felon. Neither party was aware of the specifics of this charge. Regardless, in the instant case Lewis was charged with using a weapon in furtherance of a drug trafficking crime and he took the position that he was entrapped into that crime. Both crimes involved illegal possession of a weapon, albeit in potentially differing circumstances. As such, the Court did not err in admitting the conviction because it was probative of whether Lewis was predisposed to illegally possess a firearm.

This Court also admitted Lewis' 2000 conviction for theft. Lewis and other individuals were charged in a five-count information including charges of theft and residential burglary after they broke into a residence and stole personal belongings including some Christmas presents. Lewis proffered that he pled guilty to theft after being found in possession of some stolen goods taken from a residential burglary. This conviction therefore involved entering a residence to commit theft possessing the items taken from that residence. The charges in the instant case involved a conspiracy and attempt to enter a residence, in this case a stash house, and commit theft, in this case of cocaine. Therefore, the theft conviction is probative of Lewis's predisposition to enter a residence for the purpose of committing theft and the Court did not err in admitting it.

Finally, the Court admitted Lewis' 1998 misdemeanor conviction for making a false statement to a police officer for purposes of impeachment during his cross-examination. Under Federal Rule of Evidence 609(a)(2), a party may attack a witness' credibility by presenting evidence that the witness was convicted of a crime involving dishonesty or false statements. *See United States v. Galati*, 230 F.3d 254, 261 (7th Cir. 2000) *citing* Fed.R.Evid. 609(a)(2). In cases of Rule 609(a)(2) evidence, the Court does not balance the probative value against the prejudicial effect of admitting the conviction for impeachment purposes. *See United States v. Kuecker*, 740 F.2d 496, 501 (7th Cir. 1984). One can hardly argue that a conviction for making a false statement is not a conviction involving "dishonesty or false statements." Here, Lewis testified in his own defense and the conviction was allowed into evidence only to impeach his testimony

### Reference to Conviction for Possession of a Firearm by a Felon

Lewis also argues that this Court erred by allowing the Government to refer to his 1995 conviction as "possession of a firearm by a felon." Specifically, because this Court found Lewis' only conviction preceding this conviction - his conviction for burglary in 1991 - inadmissible, Lewis argues that it was error to refer to this conviction as "possession of a firearm by a felon" because it implicitly informed the jury of his prior inadmissible conviction - possibly leading them to speculate as to the nature of that conviction.

Lewis has cited, and this Court has found, no caselaw requiring the Court to "sanitize" his prior conviction for possession of a firearm by a felon to eliminate any insinuation that he had a prior felony. Lewis cites to *United States v. Stokes*, 211 F.3d 1039 (7th Cir. 2000) and *United States v. Poore*, 594 F.2d 39 (4th Cir. 1979) for the premise that it was proper for this Court to remove any reference to a prior conviction from Lewis's admitted conviction for possession of a firearm by a

felon. In both of those cases reference to the mere fact of a prior felony was allowed. Reference to the nature or details of the prior felony was not allowed. Specifically, in *Stokes* the defendant was charged with being a felon in possession of a firearm and the defendant stipulated to the fact that he had previously committed a crime such that the jury was told only that "prior to November 10, 1998, the defendant had been convicted of a crime." *See Stokes*, 211 F.3d at 1042-43. In *Poore*, the Fourth Circuit found that the district court erred in allowing an indictment for possession of a firearm by a felon that stated the nature of the underlying felony - carrying a handgun - to be presented to the jury. *See Poore*, 594 F.2d at 40-41. Specifically, the defendant having stipulated to the prior commission of a felony, the Fourth Circuit found error in disclosing the nature of the felony - not the fact of a prior felony - to the jury. *See Id.* at 41. Here, the admission of Lewis' felon in possession of a firearm conviction did not reveal any of the details of the underlying felony, just the fact of an underlying felony.

In a similar context - when a prior conviction is used to impeach a defendant who testifies - the government may state the felony charged and its date and disposition. *See United States v. Smith*, 454 F.3d 707, 716 (7th Cir. 2006) *citing Campbell v. Greer*, 831 F.2d 700, 707 (7th Cir. 1987). It may not necessarily go into the details of the crime where the defendant does not "open the door" to such details through his testimony. *See Id.*; *see also United States v. Fountain*, 768 F.2d 790, 795 (7th Cir. 1985) (prosecutor entitled to inquire slightly into prior crimes but not to "harp on" them in great detail). Here, in response to Lewis's decision to assert an entrapment defense and to testify, the Court allowed the Government to state the correct title of the prior crime. As such, the Court did not err. Therefore, this Court finds with regard to Lewis that no error or combination of errors occurred at trial such that a new trial for Lewis is warranted in the interests of justice.

<u>**Williams' Alleged Errors at Trial**</u>

Williams also asserts that this Court erred at and before trial by: 1) denying his motion to dismiss Counts One and Three of the Indictment; and 2) by providing two erroneous instructions to the jury. Williams also reserves his rights, stating that he does not forfeit any objection made during the course of trial nor does he forfeit any error he may identify after a complete review of the final trial transcripts.

As to Williams' argument that this Court erred in denying his motions to dismiss Counts One and Three of the Indictment, he does not raise any new arguments but rather re-raises the arguments in his previously ruled-upon motion. As such, this Court affirms and incorporates the previous detailed opinion on the matter. (Dkt. 75.)

After two jury instructions conferences on June 1, 2008 and June 11, 2008, Williams' objected to two jury instructions. First, he objected to the instruction setting forth the elements of a narcotics conspiracy (Count One). The instruction read:

> A conspiracy is an agreement between two or more persons to accomplish an unlawful purpose. To sustain a charge of conspiracy with the intent to distribute cocaine, as charged in Count One, the government must prove: First, that the conspiracy as charged in Count One existed, and Second, that the defendant you are considering knowingly became a member of the conspiracy with an intention to further the conspiracy. If you find from your consideration of all the evidence that each of these propositions has been proved beyond a reasonable doubt, then you must find that defendant guilty of Count One. If, on the other hand, you find from your consideration of all of the evidence that any of these propositions has not been proved beyond a reasonable doubt, then you must find that defendant not guilty of Count One. A conspiracy may be established even if its purpose was not or could not be accomplished. To be a member of the conspiracy, the defendant you are considering need not join at the beginning or know all of the other members or the means by which its purpose was to be accomplished. The government must prove beyond a reasonable doubt that the defendant was aware of the common purpose and was a willing participant.

Williams objected to the addition of the phrase "or could not" to the instruction because this phrase does not appear in Seventh Circuit Pattern Instruction 5.08 and because he did not intend to base any arguments on the fact that the object of the conspiracy could not be accomplished.

Jury instructions must be accurate statements of the law that are supported by the facts in the case. *See United States v. Mancillas*, 183 F.3d 682, 707 (7th Cir. 1999). A conspiracy may exist even where it was impossible to accomplish the object of that conspiracy. *See United States v. Shively*, 715 F.2d 260, 266 (7th Cir. 1983) ("it does not matter that the ends of the conspiracy were from the beginning unattainable") *quoting United States v. Giordano*, 693 F.2d 245, 249 (2nd Cir. 1982); *see also United States v. Bounos*, 730 F.2d 468, 469-70 (7th Cir. 1984) (fact that undercover government agent never intended to give cocaine to defendants did not preclude finding of conspiracy to possess cocaine with intent to distribute). Therefore, the instruction was a correct statement of the law.

The instruction was also warranted by the facts of the case. This case involved a conspiracy to steal nonexistent cocaine from a nonexistent stash house. The object of the conspiracy was invented by ATF. As such, an instruction to the jury informing them that a conspiracy could exist even if its object, like the object here, could not be accomplished, was warranted to ensure that they understood the relevant boundaries of conspiracy liability.

Williams also objected to an instruction as to the definition of a firearm. The instruction stated: "The term firearm means (A) any weapon (including a starter gun) which will or is designed or may be readily converted to expel a projectile by the action of an explosive; or (B) the frame or receiver of any such weapon." This language is a correct statement of the law as it is taken verbatim

from 18 U.S.C. § 921(a)(3). Williams argued not that this was an incorrect statement of the law but that it was unnecessary because it did not address anything in dispute.

Special Agent Timothy Wilson ("Wilson") testified that the after the firearm at issue was recovered at the arrest site, the agents test fired it and the firearm successfully fired. Williams' counsel cross-examined Wilson as to the functionality of the weapon and Wilson testified that although it test-fired functionally it had some problems with its slide and required slight manual manipulation to fire. Given this testimony that the firearm was, in effect, slightly broken, the instruction informing the jury of what legally constitutes a firearm was warranted by the facts and helpful to the jury in determining one of the elements of one of the counts. As such, no error occurred during trial that warrants granting Williams a new trial in the interest of justice.

## Sufficiency of the Evidence

Both Defendants argue that insufficient evidence supports guilty verdicts on Counts One and Three such that they are entitled to a judgment of acquittal or, in the alternative, a new trial.

### *Conspiracy to Possess with Intent to Distribute Cocaine in Violation of 21 U.S.C. § 846*

*Lewis*

In order to prove Lewis guilty of conspiracy under 21 U.S.C. § 846, the government needed to prove that two or more people agreed to commit an unlawful act--here, to rob a stash house; and the defendant knowingly and intentionally joined that agreement. *See United States v. Duran*, 407 F.3d 828, 835 (7th Cir. 2005) *citing United States v. Thornton*, 197 F.3d 241, 254 (7th Cir. 1999). The agreement need not be formal and may be established through circumstantial evidence. *See United States v. Corson*, –F.3d —, 2009 WL 2616041, at *5 (7th Cir. August 27, 2009); *see also*

*United States v. Gilmer*, 534 F.3d 696, 701 (7th Cir. 2008) (government must prove either an implicit or explicit understanding to work together to commit the offense).

Lewis argues that the Government did not present sufficient evidence that an actual agreement to rob the stash house existed. Specifically, he argues that everything he and the other potential conspirators said in their conversations with Gomez amounted to "tough talk" with no basis in reality. As support for this theory, Lewis argues that the would-be conspirators planned to storm the stash house pretending to be police, carry guns, tie up the cartel members at the stash house, and steal the cocaine. Lewis, Williams and Billingsly, however, did not bring any supplies with them to carry out their plan: no rope or duct tape, no false police gear and only one slightly broken gun.

In his initial meeting with Gomez on December 14, 2006, Lewis said he was interested in the robbery and could recruit a crew. At his next in-person meeting with Gomez on December 18, 2006, Lewis brought a crew - Williams and B - and advised Gomez that he had one more crew member that could not attend the meeting. Williams and B stated that they would commit the robbery. In addition, Lewis explained a plan he himself concocted. He planned to enter the stash house feigning a police raid as Gomez exited, get all the occupants on the floor, remove their clothes and tie them up. Williams echoed his agreement with this plan and affirmed his agreement to participate in the robbery. *See Corson*, 2009 WL 2616041, at * 8 (defendants discussing plan for robbery constitutes evidence of agreement among themselves, not just with the CI).

Lewis had further phone conversations with Gomez in the following weeks during which he stated that he was looking for firearms for use in the robbery and that he and his crew were ready to do the robbery. Gomez then called Lewis on January 4, 2007 to tell him that the robbery would take place that night and to arrange to meet him in a parking lot at 61st and Cass Avenue. Although

the meeting was not recorded, Gomez testified that thereafter, Lewis, Williams and Billingsly arrived together in one car at the designated parking lot.   Gomez testified that he wanted to show them the storage locker where they would take the cocaine after the robbery.  Lewis and Williams rode in Gomez's car with him to the storage facility while Billingsly followed behind in a second vehicle.  Video shows the group arriving at the storage facility at which point the arrests took place.

This evidence is sufficient to show that Lewis himself agreed to do the robbery, recruited a crew to assist in the robbery, brought that crew to meet with Gomez, formulated a plan for the robbery, and actually showed up with a gun at the designated meeting spot for the purpose of committing the robbery at the set time and place.  *See Id*. at * 6 (sufficient evidence to establish conspiracy rather than "tough talk" where defendants met with CI to discuss a fake stash house robbery, discussed their plan to execute the robbery, and affirmed their interest in doing the robbery). Viewed in the light most favorable to the Government, this is sufficient evidence to support Lewis' conviction on Count One.  Indeed, any argument that Lewis never intended to do the robbery is directly contradicted by the evidence, both from Gomez's testimony and the videotape at the storage facility that shows Lewis, Williams and Billingsly arriving at the designated meeting place at the designated time with a gun.  *See Id*. at *7-8 (fact that defendants showed up together in the pre-robbery meeting place evidence of agreement among defendants).

***Williams***

Williams also argues that the Government presented insufficient evidence to convict him of conspiracy.  Specifically, he argues that there was insufficient evidence that a conspiracy existed and that he became a member of the conspiracy with the specific intent to further its goal.  As discussed

above, there was sufficient evidence for a jury to find that an agreement existed. In addition, although there is less evidence supporting the conviction of Williams than Lewis, there was sufficient evidence for a jury to find that Williams knowingly joined the agreement to rob the stash house.

Williams made his first appearance at the recorded December 18, 2006 meeting. He showed up at the meeting, to which Lewis was to bring his "crew," with Lewis and B. After hearing a description of the robbery Williams agreed to participate by saying "I'm down with that." Williams also contributed his two cents to the specific plan to effectuate the robbery. In response to Lewis' proposed plan to yell "police" and frighten the cartel members in the stash house, Williams said that the occupants "ain't going to up no Tec," meaning that they would not be able to get to their guns and combat the weapon that he would be bringing. He again indicated his agreement with the plan by stating, "I'm going in sticking and moving, just sticking and moving, get in get out." He also proposed that he enter the stash house first because he was the shortest. He further indicated his agreement to participate in the plan by saying that he was "always ready" and that "It's going down." All these statements support a finding that Williams was aware of the plan, contributed to it, and agreed with Lewis to carry it out.

At the same meeting, Williams also spelled out his plans for his proceeds from the robbery. He stated that he intended to sell his share of the cocaine in brick form because he did not have time to break it down into sale quantities. Again, a reasonable jury could infer from this statement that Williams agreed to and intended to commit the robbery because he was already planning what he would do when the robbery was completed.

Lastly, although Gomez did not have contact with Williams between the December 18 meeting and the final meeting, Williams showed up for the final pre-robbery meeting directly before the planned robbery. Specifically, he showed up to the meeting in a car with Lewis and Billingsly and he rode to the storage locker with Gomez, Rojo and Lewis. The jury could further support a finding that Williams agreed to the robbery because he actually showed up, with the alleged coconspirators, to the meeting immediately proceeding the robbery and went to see where they should place Gomez's portion of the loot. As such, based on Williams' attendance at the meetings, verbal agreements to do the robbery, contributions to the plan and the fact that he stated his plans for his profits, the jury reasonably concluded that he agreed to commit the robbery and found him guilty of conspiracy.

### *Possessing or Carrying a Firearm in Furtherance of and in Relation to a Drug Trafficking Crime in Violation of 18 U.S.C. § 924(c)(1)(A)*

#### *Lewis*

Lewis also argues that there was insufficient evidence to convict him of possessing and carrying a firearm in furtherance of, and in relation to, a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A). First, he argues that the Government's evidence with respect to this Count is largely reliant on Gomez's testimony that on the night of the supposed robbery, Billingsly brought a firearm and showed it to everyone inside the undercover vehicle. Lewis argues that because this Court should find Gomez's testimony unreliable, the evidence presented at trial was insufficient to prove Lewis guilty. Specifically, Lewis points out several aspects of Gomez's testimony, mostly regarding the failure of various recording devices, that he argues demonstrate that the testimony is unreliable and therefore cannot adequately support a jury finding of guilt on Count Three.

Determinations of witness credibility, however, are the province of the jury. *See United States v. Bailey*, 510 F.3d 726, 734 (7th Cir. 2007) ("it is for the jury to evaluate the credibility of the witnesses"); *United States v. Scott*, 145 F.3d 878, 883 (7th Cir. 1998) ("questions of witness credibility typically rest with the jury, not the court"). Testimony is only incredible as a matter of law where it is "physically impossible for a witness to have observed that which he claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all." *Bailey*, 510 F.3d at 733 *quoting United States v. Hunter*, 145 F.3d 946, 949-50 (7th Cir. 1998). Testimony is not incredible as a matter of law simply because a witness has been impeached or has a motive to provide evidence favorable to the government. *See Scott*, 145 F.3d at 883.

The trial revealed that ATF made missteps in investigating this case: they failed to record all the relevant meetings and conversations including the final "pre-robbery" meeting, failed to make a record of any attempts to determine the cause of the malfunctions and to recover recordings, and Agent Gomez failed to notify Agent Wilson of the various problems in a timely manner, and failed to write reports in a timely manner on occasion. All of this was effectively addressed during cross-examination by talented defense counsel. The jury heard this evidence and the cross-examination and still credited Gomez's testimony. This Court finds no reason why this credibility finding should not remain with the jury. *See United States v. Carraway*, 108 F.3d 745, 752 (7th Cir. 1997) ("even assuming that some question was raised as to the veracity of the witness . . . [defendant did not explain] why this was not the routine sort of credibility question that lies within the province of the jury to sort out").

Also, Gomez's testimony was not the only evidence that supported the conclusion that Billingsly brought a gun for use during the robbery. In the video of the arrests shown at trial, the

jury was shown a grainy video of Billingsly throwing something under his car immediately prior to his arrest. Agents later recovered a gun from under the car Billingsly drove and two partially-filled boxes of ammunition for the gun from the trunk of that car. In addition, Lewis and others extensively discussed obtaining firearms during their meetings with Gomez. As such, it was reasonable for the jury to infer from both Gomez's testimony and the additional evidence that the recovered gun was brought to further the conspiracy to rob the stash house.

Lewis additionally argues, without citation, that none of the evidence from the day of the arrest should be considered as to the 18 U.S.C. § 924(c)(1)(A) charge since the jury acquitted Lewis of attempt, they found that the conspiracy took place during or prior to the December 18, 2006 meeting. The remaining evidence is insufficient for conviction, Lewis argues, because no firearm was used, displayed or possessed during the December 18, 2006 meeting.

In order to prove attempt, the government was required to prove that the defendant had the specific intent to commit the crime at issue and took a substantial step toward the commission of that crime. *See United States v. Johnson*, 376 F.3d 689, 693 (7th Cir. 2004). "A substantial step is something more than mere preparation, but less than the last act necessary before the actual commission of the substantive crime." *United States v. Barnes*, 230 F.3d 311, 315 (7th Cir. 2000). The fact that the jury found Lewis innocent of attempt does not compel the conclusion that the conspiracy was terminated before the final pre-robbery meeting to which Billingsly brought the gun. Rather, the jury could have found that Lewis did not take a substantial step toward completion of the crime prior to his arrest. In addition, the Government presented evidence to support a contrary conclusion. That is, Lewis, Williams and Billingsly showed up for the pre-robbery meeting together with a gun and ammunition.

*Williams*

Williams also argues that the Government failed to adequately prove him guilty of Count Three of the Indictment. Williams relies on the standard of proof for criminal liability as an aider or abettor for a co-defendant's possession of a firearm.[1] In order to prove that an individual aided and abetted the use of a firearm the government must prove that "1) the defendant knew, either before or during the crime, of the principal's weapon possession or use; and 2) the defendant intentionally facilitated that weapon possession or use once so informed." *United States v. Moore*, 572 F.3d 334, 341 (7th Cir. 2009) *citing United States v. Taylor*, 226 F.3d 593, 596 (7th Cir. 2000). In such cases, "merely aiding the underlying crime and knowing that a gun would be used or carried cannot support a conviction." *Id. quoting United States v. Woods*, 148 F.3d 843, 848 (7th Cir. 1998).

The Court need not, however, evaluate the evidence under this standard because Williams could be found guilty of Count Three under a theory of co-conspirator liability. *See United States v. Loscalo*, 13 F.3d 374, 383 (7th Cir.1994) (jury given alternate means of convicting a defendant either under a conspiracy theory or as an aider and abettor). A conspirator is criminally liable for foreseeable crimes committed by coconspirators in furtherance of the conspiracy. *See United States v. Hach*, 162 F.3d 937, 951 (7th Cir. 1998). The jury could find Williams guilty of Count Three "if a coconspirator possessed a gun in furtherance of the drug conspiracy and it was reasonably foreseeable to the defendant that his accomplice would do so." *United States v. McLee*, 436 F.3d

---

[1] Williams also appears to argue, without citation, that the 18 U.S.C. § 924(c) charge is deficient because it was not charged under an aiding and abetting theory under 18 U.S.C. § 2. As discussed in this section, Williams could be found guilty under a conspiracy theory of liability. Regardless, the indictment is not deficient because it does not contain a charge of aiding and abetting. Title 18 U.S.C. § 2(a) need not be specifically pleaded and a defendant indicted for a substantial offense may be convicted for aiding and abetting so long as no unfair surprise results. *See United States v. Tucker*, 552 F.2d 202, 204 (7th Cir. 1977).

751, 758 (7th Cir. 2006) *citing United States v. Chairez*, 33 F.3d 823, 826-27 (7th Cir. 1994). The jury was instructed accordingly.[2]

Sufficient evidence supports a guilty verdict on Count Three under a conspiratorial theory of liability. Williams, like Lewis, argues that there is insufficient evidence to convict him because Gomez's testimony about the events of the final pre-robbery meeting is not reliable. As discussed in more detail above, determinations of witness credibility are the province of the jury. *See Bailey*, 510 F.3d at 734. Here, both Lewis' and Williams' attorneys had an opportunity to cross-examine Gomez and the jury found at least some portion of his testimony affirming that Billingsly, who drove with Lewis and Williams to 61st and Cass and then followed the group to the storage facility, brought a gun to aid in the robbery that he showed that gun to Gomez and the others. Again, the jury could see Billingsly throw something under his car in the video of the arrest and both the gun and two ammunition boxes containing 93 rounds were recovered. In addition, Williams was present on video for the December 18th meeting during which the conspirators discussed the need for firearms, and Williams himself specifically stated that he "still got time to call around," which may be interpreted as a statement that he still had time to look around for more firearms. All this amounts to sufficient evidence for the jury to have found beyond a reasonable doubt that Williams was guilty of Count Three.

---

[2] The jury was instructed as follows: "A conspirator is responsible for offenses committed by his fellow conspirators if he was a member of the conspiracy when the offense was committed and if the offense was committed in furtherance of and as a foreseeable consequence of the conspiracy. Therefore, if you find a defendant guilty of the conspiracy charged in Count One and if you find beyond a reasonable doubt that while he was a member of the conspiracy, any one of his fellow conspirators committed the offenses in Count Three in furtherance of and as a foreseeable consequence of that conspiracy, then you should find him guilty of Count Three." The jury was also instructed as to aider and abetter liability.

## Entrapment as a Matter of Law

As noted above, Lewis presented an entrapment defense at trial. He now argues that he should not have been convicted of any of the counts of the Indictment because he was entrapped as a matter of law. In order to raise an entrapment defense, the defendant must show evidence of both government inducement to commit the crime at issue and lack of predisposition. *See United States v. Haddad*, 462 F.3d 783, 790 (7th Cir. 2006). Once the defendant establishes these factors the burden shifts to the government. *See United States v. Blassingame*, 197 F.3d 271, 280 (7th Cir. 1999). In order to defeat an entrapment defense, the government must prove beyond a reasonable doubt either that the defendant was predisposed to commit the crime or that the government did not induce the commission of the offense. *See Id. citing United States v. Santiago-Godinez*, 12 F.3d 722, 722 (7th Cir. 1993).

A defendant who takes advantage of an "ordinary opportunity" to commit a crime - not an extraordinary opportunity such as may entice a law-abiding person - has not been entrapped. *See Blassingame*, 197 F.3d at 281 *citing United States v. Evans*, 924 F.2d at 717. Rather, in such a case, the person is predisposed in that the ordinary profits of crime are enough incentive to commit a crime. *Id*. In determining whether a defendant is predisposed to commit an offense, this Court considers: 1) the defendant's character or reputation; 2) whether the government initially suggested the criminal activity; 3) whether the defendant engaged in the criminal activity for profit; 4) whether the defendant evidenced a reluctance to commit the offense that was overcome by government persuasion; and 5) the nature of the inducement and persuasion by the government. *See United States v. Millet*, 510 F.3d 668, 676 (7th Cir. 2007). The most important factor is whether the defendant exhibited a   reluctance to commit the offense which was overcome by repeated

government inducement.  *See Blassingame*, 197 F.3d at 281 *citing United States v. Kaminski*, 703 F.3d 1004, 1008 (7th Cir. 1983).

"When the Government's quest for conviction leads to the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law, the courts should intervene." *Jacobson v. United States*, 503 U.S. 540, 553-54. "Entrapment as a matter of law occurs only when the absence of a defendant's predisposition appears from the uncontradicted evidence." *United States v. Haddad*, 976 F.2d 1088, 1095 (7th Cir. 1992) *citing Kaminski*, 704 F.2d at 1007.

Lewis's entrapment defense rested almost entirely on his own testimony at trial.  He testified that he only agreed to commit the robbery because Rojo, the Government's confidential informant, threatened him and his family.  He argues that this testimony is uncontradicted and thus supports a finding of entrapment as a matter of law.  Lewis testified that he first met Rojo at a neighbor's apartment in September of 2006.  The second time he met Rojo, despite his initial refusals, Rojo persuaded him to use some cocaine.  Lewis began to use cocaine with Rojo frequently and by his own account became addicted.  Eventually, Lewis owed Rojo approximately $500 for cocaine.  In November of 2006 Rojo became aggressive about collecting the debt and eventually told Lewis that he could work off the debt by selling drugs for him.  Rojo gave Lewis some cocaine to sell which Lewis instead used himself.  After using the cocaine he was expected to sell, Lewis owed Rojo about $1000.  Rojo became more aggressive and threatened to hurt Lewis or his family.  Rojo suggested that Lewis could repay his debt by helping rob a stash house.  Rojo suggested the stash house robbery five or six times before Lewis agreed to participate.  Although Lewis had never robbed a stash house before, he agreed to do it because he was afraid Rojo would harm him or his family if

he did not promptly repay the debt. Rojo told Lewis that he would need to impress "Loquito" and told Lewis to tell Gomez that he had done a stash house robbery before. Lewis also testified that he had no guns at the time he first met with Gomez but told Gomez that he had guns so that he could get the job. He further testified that during one of his unrecorded phone conversations on the day of the robbery he told Gomez that he could not do the robbery. According to Lewis, Gomez became upset and asked to meet with Lewis at 61 Street and Cass. This was the only reason he showed up at the final meeting.

To begin, Lewis's entrapment defense largely depends on whether the jury found his testimony credible, which it appears it did not, and as discussed at length above, the determination of the credibility of witnesses is generally the province of the jury - not the Court. *See Carraway*, 108 F.3d at 752; *see also United States v. Gurolla*, 333 F.3d 944, 956 (9th Cir. 2003) (credibility of defendant's explanation that he committed a crime because he was threatened was for jury to decide). Notably, the Government introduced a conviction for making a false statement to a police officer that undermined Lewis's credibility. Also two of Lewis's prior convictions, although not entirely analogous, support a jury finding that he was predisposed. He was previously convicted of possession a firearm by a felon and felony theft. Although neither of these convictions involves a truly analogous drug offense, a jury could infer from them that Lewis had previously stolen and used a firearm that he was prohibited from using - both of which are elements of the crimes at issue in this case.

Regardless, Lewis' testimony was controverted by other evidence. Lewis testified that he only became involved in the robbery because he was terrified of Rojo and needed to pay him back. The videos presented during trial, however, show a much different relationship between Lewis and

Rojo. In the video of the December 15 meeting, Lewis smiles, laughs and jokes with Rojo and does not appear frightened. Lewis also gave testimony that undermined his assertion that he was compelled to do the robbery to pay a relatively small - $1000 - debt. His mother was paying for an attorney to represent him in an ongoing custody battle and his fiancé was a nurse with regular income while he stayed home with the children. The jury could infer that Lewis, if he incurred such a debt, could attempt to borrow money for him mother or his fiancé.

In addition, although Lewis testified that he had never committed a robbery like this before and that he neither had access to a crew nor any firearms, he repeatedly told Gomez, beginning at their first meeting, that he had done something like this before, that he had a professional crew - not a bunch of amateurs - that were "hungry" to do the robbery and that he had access to firearms. He produced other potential crew members at the December 15 meeting. Lewis himself, not Rojo or Gomez, generated a reasonably detailed game plan for the robbery. Lewis appears entirely willing. He does not appear goaded into participating. Based on the evidence that Lewis was not afraid of Rojo, had other sources of getting the $1000 to pay the alleged debt and Lewis's proactive role and insistence that he had committed such a robbery before and had the means to do so, the jury could find beyond a reasonable doubt that he was predisposed to commit the charged crime, simply took advantage of an "ordinary opportunity" to commit the crime and therefore was not entrapped.

### *Coercion as a Matter of Law*

Lewis also argues that he was coerced as a matter of law. A defendant attempting to establish a defense of coercion must show that: 1) he reasonably feared imminent death or serious bodily harm unless he committed the offense; and 2) he had no reasonable opportunity to refuse to commit the offense and avoid the threatened injuries. *See United States v. Sawyer*, 558 F.3d 705,

711 (7th Cir. 2009) *citing United States v. Jocic*, 207 F.3d 889, 892 (7th Cir. 2000).  The fact that a defendant feared death or injury is insufficient.  *See Id.*  "Rather 'there must be evidence that the threatened harm was present, immediate, or impending.'" *Id. quoting United States v. Tanner*, 941 F.2d 574, 587 (7th Cir. 1991).

Lewis was not coerced as a matter of law because even assuming a jury believed that he feared harm, a reasonable jury could find that the threatened harm was not impending and Lewis had a reasonable opportunity to both refuse to commit the offense and avoid the threatened injuries.  Lewis testified that he owed a debt to Rojo and that Rojo became aggressive and demanded the money in November of 2006.  He did not meet with Gomez to begin planning the stash house robbery until December 15, 2006 and the robbery was not set to occur until January 7, 2007.  There is no evidence that at any point Rojo was in a position to immediately harm Lewis or his family.  A reasonable jury could find that during the time between when Rojo first began to threaten Lewis and when the robbery was to take place he could have reported the danger to the police, moved or taken many other actions to both avoid harm at the hands of Rojo and avoid committing the offense.  *See Sawyer*, 558 F.3d at 712 (defendant who claimed to refer drug buyers to witness over a period of time in response to threats of harm if she did not pay off boyfriend's debt had reasonable opportunity to refuse);  *Jocic*, 207 F.3d at 892-893 (defendant had a reasonable opportunity to abandon becoming getaway driver for bank robbery by running away while his passenger was robbing the bank).  As such, Lewis was not coerced as a matter of law.

For the reasons stated above, Lewis and Williams' Motions for a New Trial and Motions for a Judgment of Acquittal are denied and their convictions stand.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: October 15, 2009